UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>DANIEL SAMUEL ETA | Case No. 18-CR-818-1<br><br>Judge John Robert Blakey |

**MEMORANDUM OPINION AND ORDER**

On February 12, 2018, Defendant Daniel Samuel Eta arrived at Hartsfield-Jackson Atlanta International Airport on an international flight from Nigeria, where he planned to catch a connecting flight to Chicago. When he arrived in Atlanta, Customs and Border Protection agents stopped him, took temporary possession of his cellphones, and scrolled through them. The fruits of that border search led to his arrest and indictment here. Defendant has moved to suppress the search of his cellphones. *See* [576]. Based upon the parties' briefs and arguments, and the evidentiary hearing held on March 11, 2024, this Court now denies his motion to suppress.

**I.     Court Proceedings & Findings of Fact**

On February 12, 2018, Defendant arrived at the Atlanta airport on an international flight from Lagos, Nigeria. At that time, Customs and Border Protection ("CBP") conducted a primary, and then secondary search, of Eta's phones, having been tipped off by FBI Special Agent Andrew Innocenti, who was investigating Eta in Chicago.

On December 4, 2018, the Government filed a criminal complaint, supported by a 68–page affidavit, charging Defendant and eight others with conspiracy to commit various online scams, which bilked victims out of more than $2 million over a two–year period. Thereafter, on May 16, 2019, the Grand Jury returned a twenty–seven–count indictment.

On November 22, 2023, Defendant moved to suppress the "fruits" of the border search of his cellphones, which had led to his arrest and indictment. *See* [576]; *Wong Sun v. United States*, 371 U.S. 471, 487–88 (1963) (suppressing unlawfully obtained evidence and any "fruit of the poisonous tree"). Specifically, Defendant moves to suppress all evidence uncovered during that initial or primary CBP search, as well as all evidence uncovered during the subsequent, more extensive searches of his two cellphones, two SIM cards, and SD card at the Atlanta airport.[1]

The Government opposes the motion, arguing that, when Defendant arrived at the Atlanta airport, CBP knew he was a Nigerian citizen with legal permanent residency status in the United States who was under investigation for leading a Nigerian money laundering and fraud organization. Furthermore, after Defendant lied when interviewed by CBP about where he lived and worked, CBP properly performed a manual inspection of Defendant's phones under its border search authority at the

---

[1] On February 16, 2018, Postal Inspector Natalie Reda submitted an application and affidavit for a search warrant for Defendant Eta's two cellphones, two SIM cards and SD card, [585-1], and the warrant issued upon probable cause. *Id.* In the current motion, Defendant challenges only the February 12, 2018 search; he does not challenge the warrant itself.

Atlanta airport. *See* [585]. Thereafter, the agents then performed a lawful forensic search of the cellphones.

On March 11, 2024, this Court held an evidentiary hearing to resolve any factual disputes arising from the Defendant's motion. At that hearing, the Government called several witnesses: FBI Special Agent Andrew Innocenti, CBP Officer Brian Coder, CBP Officer Carlos Carrasquillo, and United States Postal Inspector Natalie Reda.[2]

Special Agent Innocenti testified that he was assigned the investigation of Defendant's connection to various online fraud schemes originating primarily in West Africa, in which individuals in the United States were victimized and fraudulent proceeds were then moved to Nigeria or other destinations. Special Agent Innocenti testified that, in May of 2016, he conducted a post–arrest interview of a cooperator named Samson Alimi, who indicated that he was working for Defendant on various fraud schemes (including romance and secret shopper scams) originating in Nigeria. Upon review, Special Agent Innocenti corroborated this information with messages coming through Alimi's phone during the interview, which confirmed that Alimi was, in fact, receiving directions concerning fraud proceeds and related information about multiple bank accounts and third-party entities involving those funds.

---

[2] Based upon the in-court proceedings, this Court makes the factual finding that Special Agent Innocenti, CBP Officers Coder and Carrasquillo, and Postal Inspector Reda all testified credibly. *United States v. Thurman*, 889 F.3d 356, 366 (7th Cir. 2018) (Generally, the trial court's credibility determinations are entitled to deference "because, unlike our review of transcripts, the district court 'had the opportunity to listen to testimony and observe the demeanor of witnesses at the suppression hearing.'") (quoting *United States v. Biggs*, 491 F.3d 616, 621 (7th Cir. 2007) and *United States v. Parker*, 469 F.3d 1074, 1077 (7th Cir. 2006)).

Special Agent Innocenti further testified that, in connection with his investigation, he also obtained information from a separate confidential source who corroborated Alimi's information and indicated that Defendant's fraud schemes originated overseas, typically in Nigeria, and that, once the victims' monies were laundered, they were often either transferred back to Nigeria or were used to purchase vehicles, which were then shipped to Nigeria for sale. This second source provided information concerning telephone numbers and Blackberry messenger accounts that Defendant used to communicate pickups for the fraud schemes. Special Agent Innocenti also testified that, during the relevant period, he obtained banking records relating to Defendant's bank accounts, which showed that Defendant had over a million dollars moving in and out of his accounts, despite having no apparent employer or other legitimate sources of income. Based upon the training and experience of the agents, this information remained consistent with what Alimi and the second, confidential source said about Defendant's fraud and money laundering activities.

Special Agent Innocenti also testified that, around December 2017, he learned that Defendant planned to travel to Nigeria and return to the United States on February 12, 2018. Innocenti reached out to CBP in Atlanta about Defendant's return flight and asked them to conduct a secondary border search of Defendant's electronics and then return them to him. Innocenti asked that he and his partner, Postal Inspector Natalie Reda, be allowed to be present during that search to facilitate the identification of evidence relating to the transnational criminal enterprise. Special Agent Innocenti stated that he did not yet have a search warrant at that time and that he did not apply

4

for a search warrant to perform a full forensic download of Defendant's phones until two days after the initial border search at the Atlanta airport.

CBP Officers Brian Coder and Carlos Carrasquillo handled the encounter with Defendant at the border on February 12, 2018. Officer Carrasquillo testified that, in February 2018, he received an FBI lead report and electronic communication concerning Defendant. The communication indicated that Defendant was part of a Nigerian money laundering organization with connections to transnational organized crime; the communication also included a photograph of Defendant and a request for a secondary inspection. *See also* [585-3] (the request for secondary inspection dated 1/16/18 advising CBP in Atlanta that Defendant "is one of the main subjects of an ongoing open investigation out of the Chicago Field Office relating to cyber-enabled fraud schemes, to include romance scams, secret shopper scams, and employment scams. Additionally, [Defendant] ETA is purported to be part of a Nigerian money laundering organization with connections to transnational organized crime.").

Officer Carrasquillo testified that he prepared a report concerning the temporary seizure of Defendant's phones at the border, and Officer Coder testified that he personally performed the initial manual inspection of Defendant's phones at customs secondary, though Coder testified that he had no independent recollection of this secondary inspection, as he conducts thousands of such inspections each year. Officer Carrasquillo testified that, during the border interview prior to the search, Defendant provided vague responses, seemed nervous, and stammered a bit, which in his experience remained consistent with concealment or not being truthful with answers;

5

he also testified that Defendant carried seven pieces of checked luggage, which in his experience also raised questions about potential contraband or unlawful activity based upon the circumstances of Defendant's travel.

United States Postal Inspector Natalie Reda testified that she previously worked as a postal inspector investigating mail fraud and, in that capacity, worked with the FBI to investigate Defendant. She testified that she traveled to Atlanta in February 2018 with Special Agent Innocenti to consult with CBP as Defendant came across the border from Nigeria. She testified that she and Special Agent Innocenti briefed CBP Officer Carrasquillo on their international fraud investigation and conferred with CBP concerning the veracity of Defendant's responses to questions posed during the CBP interview.[3]

As to the initial search of Defendant's phones, Inspector Reda testified that CBP Officers manually accessed Defendant's phones and scrolled through as she and Special Agent Innocenti looked on and documented certain contents in handwritten notes and photographs. Special Agent Innocenti testified that he and Inspector Reda were present with the CBP Officer as he was scrolling through, and they indicated at different points to stop so they could review bank account information and other information consistent with their fraud investigation. At this point, based upon the totality of the circumstances, including what they saw as CBP Officer Coder scrolled, the agents knew the phones contained evidence of criminal activity, and they then asked the FBI

---

[3] For example, in response to questions from CBP, Defendant indicated that he lived in Minnesota, but Innocenti and Reda believed, based upon their investigation, that Defendant lived in the Chicagoland area, and they told CBP Officers as much.

6

Computer Analysis and Response Team ("CART") to begin imaging both of Defendant's cellphones.

Special Agent Innocenti also testified that, although they anticipated a short border search (with the cellphones quickly being returned to Defendant to maintain the covert nature of their investigation), the imaging process took longer than expected, so the officers decided to seize the cellphones and obtain search warrants for a forensic download. At the border, they instructed Defendant that he should contact Special Agent Innocenti to coordinate the return of his cellphones in Chicago. Innocenti testified that Defendant did, in fact, contact him about the devices and later got his cellphones back.

At the conclusion of the evidentiary hearing, counsel argued the motion. This Court then took the matter under advisement and now issues its findings of fact and conclusions of law.

## II.　Analysis & Conclusions of Law

The Fourth Amendment protects "against unreasonable searches and seizures." U.S. Const. amend. IV. In the absence of a warrant, a search is reasonable "only if it falls within a specific exception to the warrant requirement." *Riley v. California*, 573 U.S. 373, 382 (2014). One such exception applies at the country's borders, including at international airports, which are "the functional equivalent of an international border." *United States v. Wanjiku*, 919 F.3d 472, 480 (7th Cir. 2019). *See also Almeida-Sanchez v. United States*, 413 U.S. 266, 273 (1973) ("a search of the passengers and cargo of an airplane arriving at a St. Louis airport after a nonstop flight from Mexico City would

7

clearly be the functional equivalent of a border search."); *United States v. Ramsey*, 431 U.S. 606, 616 (1977) ("That searches made at the border, pursuant to the long-standing right of the sovereign to protect itself by stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the border, should, by now, require no extended demonstration."). "Since the founding of our Republic, Congress has granted the Executive plenary authority to conduct routine searches and seizures at the border, without probable cause or a warrant." *United States v. Montoya de Hernandez*, 473 U.S. 531, 537 (1985).

Defendant argues initially that the border exception does not apply here because CBP was not searching for contraband when it searched his phone. But neither the Supreme Court nor the Seventh Circuit has ever cabined the border exception in this way. On the contrary, the Supreme Court has instructed that border searches "are reasonable simply by virtue of the fact that they occur at the border." *Ramsey*, 431 U.S. at 616. In this case, the agents acted well-within their constitutional authority in performing a traditional border search.[4]

---

[4] Even if, as Defendant urges, the border exception were limited to subjective "border" purposes, the Government's "interest in preventing crime at international borders 'is at its zenith' and it follows that a search for evidence of either contraband or a cross-border crime furthers the purposes of the border search exception to the warrant requirement." *Alasaad v. Mayorkas* 988 F.3d 8, 19 (1st Cir. 2021). Likewise, in *United States v. Carpenter*, a 2023 district court case upon which Defendant relies, the trial court recognized that the border exception applies if the search furthers "a sovereign interest underlying the exception whether by preventing the entry of people or contraband, investigating cross-border crime, collecting or regulating duties, or otherwise safeguarding national security." *United States v. Carpenter*, No. 20 CR 376-2, 2023 WL 358794, at *4 (N.D. Ill. Jan. 23, 2023). Here, the searches in this case did, in fact, involve such sovereign "border" purposes. Special Agent Innocenti and Postal Inspector Reda asked CBP in Atlanta to assist with their Chicago-based investigation of cross-border crime and transnational criminal activity, and CBP Officers thus knew about the nature of the investigation when they pulled Defendant aside for a secondary customs search of his phones. In short, even under Defendant's narrow constitutional reading, the border exception applies.

First, the agent's manual "scrolling" search constituted a lawful routine border search. *United States v. Mendez*, 103 F.4th 1303, 1305 (7th Cir. 2024), holds that "searches of electronics at the border—like any other border search—do not require a warrant or probable cause" and "routine, manual" searches performed at the border do not even require "individualized suspicion." In *Mendez,* the defendant arrived at O'Hare International Airport on an international flight from Ecuador and was passing through Customs and Border Protection when a CBP agent pulled him aside for inspection, unlocked and scrolled through his cell phone, and found child pornography in his photo gallery. 103 F.4th at 1305. At that time, CBP had flagged Mendez based upon his arrest record and his prior travel history; he was also traveling alone and returning from Ecuador, "which CBP officers classified as a potential child-trafficking source country." *Id.* Mendez argued that the search of his phone required a warrant and probable cause or at least reasonable suspicion. *Id.* The Seventh Circuit rejected his arguments. *Id.* at 1306–11. The same result obtains here.[5]

---

[5] This Court follows binding Seventh Circuit precedent and rejects the Ninth Circuit's decision in *United States v. Cano*, which, in contrast to the majority of circuit courts, held that "cell phone searches at the border, whether manual or forensic, must be limited in scope to a search for digital contraband." 934 F.3d 1002, 1007, 1017–18 (9th Cir. 2019). The other circuit courts have endorsed a rule consistent with *Mendez*, *see Alasaad v. Mayorkas*, 988 F.3d 8, 20 (1st Cir. 2021) (The "border search exception is not limited to searches for contraband itself rather than evidence of contraband or a border-related crime."); *United States v. Gurr*, 471 F.3d 144, 149 (D.C. Cir. 2006) (holding that in the context of border searches, the "distinction ... between contraband and documentary evidence of a crime is without legal basis"); *United States v. Xiang*, 67 F.4th 895, 900 (8th Cir. 2023) (rejecting argument that the Fourth Amendment does not permit border searches for evidence); *United States v. Nkongho*, No. 22-4261, 2024 WL 3350850, at *5-6 (4th Cir. July 10, 2024) (Despite "the privacy interests at stake, forensic searches conducted under the border search exception are critical for preventing cross-border crime and the importation of contraband" but "given the sheer mass of intimate information available in a forensic search, the government may rely on the border search exception to conduct such a search" [only where it can] "show that it possesses 'individualized suspicion of an offense that bears some nexus to the border search exception's purposes" which includes among other things "evidence of ongoing transnational criminal

*Mendez* confirms that "routine or otherwise, searches at the border 'never' require a warrant or probable cause." *Id.* at 1307 (citing *United States v. Ramsey*, 431 U.S. 606, 619 (1977)). This Court thus rejects Defendant's claim that CBP needed a warrant to seize and search his cellphones at the border.

Likewise, the law does not require reasonable suspicion to manually search Defendant's cellphones at the border. In *Mendez*, the court held that "brief, manual searches of a traveler's electronic device are 'routine' border searches requiring no individualized suspicion." 103 F.4th at 1310 (citations omitted). As a result, this Court need not consider the question of reasonable suspicion to find that the initial secondary inspection lawful (where CBP officers scrolled through Eta's cellphones, with Special Agent Innocenti and Inspector Reda looking over their shoulders), because the action constituted a lawful border search.

Were the Court to consider the question, however, this Court also finds, in the alternative, that CBP possessed more than reasonable suspicion to conduct the initial, manual, scrolling search of Defendant's cellphones. First, the CBP Officers had reasonable suspicion based upon Special Agent Innocenti's January 16, 2018 communication, which indicated that Defendant was "one of the main subjects of an ongoing open investigation out of the Chicago Field Officer relating to cyber-enabled fraud schemes, to include romance scams, secret shopper scams, and employment scams." [585-3] at 4. The communication further advised that Defendant was

---

activity") (citing *United States v. Kolsuz*, 890 F.3d 133, 143-44 (4th Cir. 2018) and *United States v. Aigbekaen*, 943 F.3d 713, 721 (4th Cir. 2019)).

"purported to be part of a Nigerian money laundering organization with connections to transnational organized crime," and these leads arose from the detailed information obtained via the ongoing investigation in Chicago, including information Agent Innocenti obtained from the interviews of two cooperating witnesses and corroborating phone and bank records.[6] And, finally, Defendant's behavior during his encounter with CBP Officers supports the existence of reasonable suspicion: he lied to the officers, carried seven pieces of checked luggage, was vague in his responses, carried numerous prohibited agricultural items, appeared nervous during the interview, and "started stuttering his words." [585-2] at 4–5.

Similarly, the subsequent, more extensive search of Defendant's cellphones was also supported by more than reasonable suspicion. Again, *Mendez* is instructive. There, after an initial search involving scrolling through Mendez's cellphone's photo gallery, CBP "conducted a more extensive, 'forensic' examination of Mendez's devices," used a data extraction technology to download a copy of the devices' photos and videos, then seized Mendez's cellphone, while allowing him to leave. 103 F.4th at 1305. Mendez moved to suppress the fruits of the cellphone search, arguing (like Defendant Eta here) that the search violated the Fourth Amendment; the district court denied the motion, and the Seventh Circuit affirmed. *Id.* at 1306, 1311. After holding that CBP did not need a warrant for either the initial scrolling, or the more extensive forensic examination

---

[6] Information obtained in the Chicago investigation supports reasonable suspicion even if CBP had no subjective firsthand knowledge of these details. *See United States v. Eymann*, 962 F.3d 273, 283–84 (7th Cir. 2020) (Under the collective-knowledge doctrine, "where law enforcement authorities are cooperating in an investigation, as here, the knowledge of one is presumed shared by all.") (citing *Illinois v. Andreas*, 463 U.S. 765, 771 n.5 (1983)).

and data extraction, the court held that it did not need to consider whether CBP's extensive forensic search required "individualized suspicion" because "customs agents had that and more once they found illicit images and videos of children on Mendez's phone during the routine search." *Id.* at 1310–11. Again, the same result obtains here.

As noted above, CBP officers knew (either firsthand or based upon the collective knowledge doctrine) that Defendant was the subject of an ongoing investigation in Chicago, and his involvement had been confirmed by Alimi and another confidential source, and various corroborating records. Alimi indicated that he was personally working for Defendant, serving as the pickup guy for the various fraud schemes, which originated in Nigeria. Messages Alimi received during the interview concerning bank accounts confirmed that he was working for, and receiving direction from, Defendant about what to do with proceeds of Defendant's scams. Information from Mount Prospect Police, who arrested Alimi, also corroborated Alimi's account of his role in Defendant's organization. Moreover, a second, independent confidential source further corroborated the information Alimi provided, confirming that Defendant was, in fact, the head of a crew of individuals operating in the greater Chicago area committing money laundering activities for online fraud scams originating in Nigeria; the witness also corroborated the use of personal bank accounts to carry out transactions in furtherance of the international fraud schemes. CBP's initial search of Defendant's cellphones also revealed messages and notifications consistent with the information obtained from the various Chicago investigation sources. In short, as in *Mendez*, by the time CBP seized Defendant's cellphones at the border, and prior to the more extensive, forensic search of

those phones, the agents possessed reasonable, individualized suspicion of international criminal activity, and more.[7]

Finally, even if the record failed to support reasonable suspicion for the more extensive searches and ultimate seizure of Defendant's cellphones, this Court would nonetheless deny Defendant's motion to suppress based upon the inevitable discovery doctrine. Under that doctrine, "illegally seized evidence need not be suppressed if the government can prove by a preponderance of the evidence that the evidence inevitably would have been discovered by lawful means." *United States v. McGill*, 8 F.4th 617, 624 (7th Cir. 2021) (citing *United States v. Pelletier*, 700 F.3d 1109, 1116 (7th Cir. 2012); *Nix v. Williams*, 467 U.S. 431, 442–44 (1984)). The government has met this burden here. The record shows that Defendant was the subject of an ongoing, multi-agency investigation and the ostensible leader of a transnational, Nigerian-based crime ring alleged to have swindled victims out of millions of dollars in an extensive web of schemes and scams. The Chicago team knew from its investigation, including its interviews with

---

[7] Indeed, considering the totality of the circumstances here, the factual record supports a finding of probable cause, not just reasonable suspicion. *See, e.g., Illinois v. Gates*, 462 U.S. 213, 231 (1983) (relevant circumstances encompass the entire factual picture, including rational inferences drawn from the facts based upon the experience of the officers; thus, the existence of probable cause "does not deal with hard certainties," but rather "with probabilities.") (quoting *United States v. Cortez,* 449 U.S. 411, 418 (1981)); *United States v. Cortez-Gomez*, 2023 WL 4405832, at *5 (N.D. Ill. July 7, 2023); *Abbott v. Sangamon Cty., Ill.*, 705 F.3d 706, 714 (7th Cir. 2013) (Although probable cause requires "something more than a hunch," it does not require a finding that an individual engaged in any unlawful activity); *United States v. Schaafsma*, 318 F.3d 718, 722 (7th Cir. 2003) (probable cause requires "only a substantial chance of criminal activity, not an actual showing of such activity."); *Fox v. Hayes*, 600 F.3d 819, 832 (7th Cir. 2010) (analysis looks at all relevant circumstances "from the perspective of what the officers knew at the time of the arrest"); *United States v. Reed*, 443 F.3d 600, 603 (7th Cir. 2006) (probable cause "is not a post hoc determination"); *United States v. Gary*, 790 F.3d 704, 707–708 (7th Cir. 2015) (Probable cause exists even though there "could have been innocent explanations" for a defendant's actions, so long as "the inference of the criminal activity was reasonable.") (citing *United States v. Funches*, 327 F.3d 582, 587 (7th Cir. 2003)).

Alimi and another confidential source, that Defendant was directing financial transactions in furtherance of the schemes, and they knew Defendant's own banking activity was tied to those schemes, as was other banking activity he directed using his cellphones. This information (including the various corroborating records obtained during the Chicago investigation) provided sufficient justification to seize the cellphones and later obtain a search warrant—especially in light of the additional evidence (the notification, texts, and banking activity) found in the initial manual search of Defendant's cellphones at the border. Without question, if Special Agent Innocenti and Inspector Reda had been unable to enlist CBP to assist with a border search, they would still have secured (as indeed they did secure, on February 16, 2018) a warrant to seize and search Defendant's cellphones. The inevitable discovery doctrine controls.

As the Seventh Circuit noted in *Mendez*, "in more than 200 years of border search precedent, neither the Supreme Court nor we have ever found a border search unconstitutional." 103 F.4th at 1307. This case proves no exception.

### III. Conclusion

For the reasons explained, the Court denies Defendant's motion to suppress [576].

Date: July 11, 2024

ENTERED:

_____
John Robert Blakey
United States District Judge